UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| A.P., a minor, by and through CRAIG R. POWERS and SUSAN R. POWERS, | : : : |
| | : Case No. 3:07CV833(MRK) |
| Plaintiffs, | : : |
| v. | : : |
| WOODSTOCK BOARD OF EDUCATION, | : : : |
| Defendant. | : : |

**RULING AND ORDER**

This action is an appeal from a state administrative hearing under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*. Currently pending before the Court is Craig and Susan Powers' ("Parents") Motion for Judgment on the Record [doc. # 30] and the Woodstock Board of Education's ("Board") Motion for Judgment on the Record [doc # 35]. For the following reasons, the Court grants the Board's Motion for Judgment on the Record and denies the Parents' Motion for Judgment on the Record.

**I.**

A.P. is a fourteen-year-old student diagnosed with a non-verbal learning disability. He attended Woodstock schools from kindergarten through April of his sixth-grade year. In April 2006, his Parents removed him from Woodstock Middle School and placed him at the Rectory School, a private school for fifth through ninth graders located in Pomfret, CT. Thereafter, the Parents requested a due process hearing with the State of Connecticut Department of Education pursuant to 20 U.S.C. § 1415. The Parents sought a ruling on four specific issues:

1

- Whether the Board failed to meet its so-called "Child Find" obligations during A.P.'s fourth-grade year.

- Whether the Board violated the procedural requirement of IDEA by utilizing Child Study Teams ("CSTs") in A.P.'s fifth-grade year.

- Whether the Board provided A.P. a free and appropriate education ("FAPE") in his sixth-grade year.

- If the Board did not provide FAPE, whether the parents' unilateral placement of A.P. at the Rectory School was appropriate and whether A.P. is entitled to other compensatory services.

A Hearing Officer heard testimony over twelve days, during which the Parents, who were represented by counsel, and the Board presented extensive exhibits and had ample opportunity to question numerous witnesses. Following the filing of post-hearing briefs, the Hearing Officer issued a comprehensive, nineteen-page, single-spaced Final Decision and Order, finding for the Board on all issues. This appeal followed.

## II.

The IDEA "represents an ambitious federal effort" to ensure that all children are given access to a public education regardless of any disabilities they may suffer. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982). Federal funding under the IDEA is available to states that "develop educational plans that are 'reasonably calculated' to ensure that all children with disabilities receive a 'free appropriate public education.'" *D.F. ex rel N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598 (2d Cir. 2005) (quoting 20 U.S.C. § 1412(a)(1)). A local education agency ("LEA") that receives federal funding under the IDEA has what is called a "Child Find" obligation, which is a duty to identify,

locate, and evaluate children who have a disability or who are suspected to have a disability. *See* 20 U.S.C. § 1412(a)(4)(A) (2000); *Handberry v. Thompson*, 446 F.3d 335, 347 (2d Cir. 2006). Children who are suspected of having a disability and who are in need of special education and related services are referred to what is often called a planning and placement team ("PPT"), which evaluates the child to determine whether to designate the child as having a disability under the IDEA. *See* 34 C.F.R. § 300.534(a)(1) (1999) (stating that after the completion of tests and other evaluative devices, "[a] group of qualified professionals and the parent of the child must determine whether the child is a child with a disability"). Once a child is designated as a child with a disability, the PPT develops an "individualized education program" ("IEP"), which outlines what special education and related services the child will receive. *See* 20 U.S.C. § 1414(a)(4) (2000); 34 C.F.R. § 300.346 (1999); *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 127 S. Ct. 1994, 2000 (2007). A parent or guardian who disagrees with the services that are provided by their local public school district may request an administrative hearing before an impartial Hearing Officer. *See* 20 U.S.C. § 1415(f) (2000); *A.S. v. Trumbull Bd. of Educ.*, 414 F. Supp. 2d 152 (D. Conn. 2006).

Federal district courts review state administrative decisions under the IDEA based on the preponderance of the evidence, giving "due weight" to a hearing officer's decision. *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). The Second Circuit has made clear that while "federal courts do not simply rubber stamp administrative decisions," they should be "mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.* (quoting *Rowley*, 458 U.S. at 206, 208). In other words, "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own

notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Deference is particularly appropriate when, as here, the hearing officer's review has been thorough and careful. *See Walczak*, 142 F.3d at 129.

## III.

**A.     Child Find**

The first issue upon which the Parents sought review is whether the Board failed to fulfill its "Child Find" obligation in 2004 during A.P.'s fourth-grade year. As explained above, the IDEA creates a duty on the part of LEAs to identify, locate, and evaluate "all children with disabilities . . . who are in need of special education and related services." 20 U.S.C. § 1412(a)(4)(A) (2000). This "Child Find" obligation also applies to "[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.125(a)(2)(ii) (1999). However, the IDEA is not an absolute liability statute and the "Child Find" provision does not ensure that every child with a disability will be found. *See, e.g., Bd. of Educ. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (holding that a "claimant must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate") (quotation marks omitted). Instead, the IDEA requires that LEAs develop policies and procedures that will enable children with disabilities in need of special education and related services to be identified. *See Handberry,* 446 F.3d at 347.

The Hearing Officer found that the Board had fulfilled its "Child Find" obligation, stating that "[i]t is reasonable to conclude the LEA provided class support to the child that was sufficient for the parents and teachers to be satisfied with his progress" and that the "child responded to the

4

classroom interventions and had reasonable academic and behavioral performance in the fourth grade." Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 13. She further found that while the school had conducted a screening for attention deficit disorder (ADD) at the request of the Parents, the screening did not diagnose A.P. with ADD and that it was "reasonable for the LEA to believe the parents intended to follow up on the ADD evaluation." *Id.* She notes that A.P. was not diagnosed with a non-verbal learning disability in the fourth grade and that such disabilities are "often diagnosed later than other disabilities."

The Court agrees with the Hearing Officer. According to the evidence in the record, Mrs. Powers and Mrs. Fulco, A.P.'s fourth-grade teacher, were in regular contact about A.P.'s progress throughout the year. Far from ignoring A.P.'s difficulties, Mrs. Fulco was proactive in identifying him as a child in need of additional teacher assistance. Mrs. Fulco testified that she used special interventions with A.P. in order to help him with inattention and handwriting. With the benefit of Mrs. Fulco's assistance, A.P. received As, Bs, and Cs on his report card, and he performed on goal on the Connecticut Mastery Tests, which he took without any special accommodations.

The Parents seem to argue that "Child Find" requires LEAs to designate every child who is having any academic difficulties as a special education student. But this is not the law. The statute defines "child with a disability" as a child who suffers from a qualifying disability *and* "who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A) (2000). The "Child Find" provision itself applies only to children with disabilities "who are in need of special education and related services." 20 U.S.C. § 1412(a)(4)(A) (2000). Thus, the fact that a child may have a qualifying disability does not necessarily make him "a child with a disability" eligible for special education services under the IDEA. *See Alvin Indep. Sch. Dist. v. A.D.*, 503 F.3d 378, 383

5

(5th Cir. 2007). The child must also need special education and related services. *Id.*

Here, all evidence suggests that in the fourth grade, A.P. did not need special education services. As Mrs. Fulco testified, A.P. responded well to the assistance she provided. He was performing at grade level and made progress throughout the year. The Parents argue that the ADD screening showed A.P. was "at risk" for ADD and that fact alone should have alerted the school to A.P.'s need for a referral to special education. However, as stated above, the Parents are correct only if A.P. was in need of special education and related services. The record indicates that he was not. Furthermore, A.P. was not merely "advancing from grade to grade," he was making progress. This is decidedly not a case in which a school turned a blind eye to a child in need. To the contrary, Mrs. Fulco acted conscientiously, communicating regularly with Mrs. Powers and utilizing special strategies to help A.P. succeed. In fact, Mrs. Powers admitted in her testimony that she was pleased with A.P.'s progress in the fourth grade. Just because Mrs. Fulco decided that A.P. did not need to be referred to special education does not mean that the Board violated its "Child Find" obligation.

Furthermore, the Court notes that it was far from clear that A.P. was suffering from a "qualifying disability" during the fourth grade, or that the school should have diagnosed it. The ADD screening did not diagnose A.P. with ADD (and in fact, according to Plaintiffs' counsel at oral argument, A.P. has never been diagnosed with ADD). It is true that A.P. was later diagnosed with a "non-verbal learning disorder,"[1] but the fact that he was not diagnosed by the school during his

---

[1] A non-verbal learning disability is described in the independent evaluation obtained by the Parents as "a neurologically based difficulty perceiving, processing, and understanding nonverbal information. The problems associated with a nonverbal learning disability often impact a child's functioning in many areas including writing, organizational skills, abstract reasoning, socialization, speeded processing, and fine motor control." *See* Administrative Record [doc. # 26], Ex. B-12 at 3.

fourth-grade year does not mean that the school failed to fulfill their "Child Find" obligations. As Plaintiffs' counsel admitted at oral argument, non-verbal learning disabilities are notoriously difficult to diagnose and even experts disagree about whether it should be considered a disability at all. In fact, even Dr. Kulas, the neuropsychologist chosen by the Parents to conduct an independent evaluation of A.P. the following year, testified that non-verbal learning disabilities are hard to detect and that children are often diagnosed at a later point than other learning disabilities, a conclusion adopted by the Hearing Officer. *See* Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 13.

Finally, the Parents argue that Mrs. Fulco believed that A.P. needed to be referred to special education, but that the school somehow thwarted her attempts to make a referral. They point to a letter that Mrs. Fulco wrote to A.P.'s fifth-grade teacher which stated she was "not surprised" that A.P. was being evaluated for special education. The letter went on to state, "I too worked at getting [A.P.] some special education help. It was explained to me that [he] had been referred in grade three and that he did not qualify for any assistance." Administrative Record [doc. # 26], Ex. B-33, at 7. Upon the request of the school, Mrs. Fulco later signed a second letter in which she stated that she was mistaken and that A.P. had not been referred in the third grade. *Id.* Ex. B-34. The Parents argue that the school coerced Mrs. Fulco into retracting her statement and that the first letter shows that the school lied to Mrs. Fulco about the earlier referral in order to prevent her from later referring A.P. to special education.

The Court need not decide what exactly occurred with the letter because Mrs. Fulco testified at the hearing that the fact that she believed that A.P. was found ineligible in the third grade would not have prevented her from referring him later in the year had she believed it was necessary. She

explained that if a child had previously been referred and found ineligible, the general practice was to wait awhile before making a second referral. However, she testified that as the year progressed and A.P. responded well to her assistance, she made a conscious decision not to refer him for special education assistance. The Hearing Officer found Mrs. Fulco's testimony credible and determined that the letter was immaterial to the question of whether the Board had satisfied its "Child Find" obligations. *See* Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 4-5.

In IDEA cases, the Court affords "the deference traditional on appellate review, to [the Hearing Officer's] assessment of the credibility of those witnesses who testified before [her]," *Cabouli v. Chappaqua Cent. Sch. Dist.*, 202 F. App'x 519, 522 (2d Cir. 2006); *see also Majidi v. Gonzales*, 430 F.3d 77, 79 n.2 (2d Cir. 2005) ("It cannot be overstated that our review of [an administrative judge's] credibility findings is highly deferential."). Here, the Court sees no reason to disturb the Hearing Officer's credibility determination regarding Mrs. Fulco's testimony. Thus, the Court agrees with the Hearing Officer that the Board did not violate its "Child Find" obligation.

**B.      Child Study Teams**

The second issue upon which the Parents sought review is whether the Board violated the procedural provisions of the IDEA by utilizing Child Study Teams ("CSTs"), as a pre-referral process during A.P.'s fifth-grade year. The facts relevant to the Parents' claim are as follows. Ms. Foisy, A.P.'s fifth-grade teacher, had concerns about A.P. and two CSTs were convened in October and December of that year to discuss whether to refer A.P. to special education. Both times, the CSTs concluded that A.P. could be accommodated as a regular education student and the teams developed action plans to address the difficulties he was having.

Sometime in the fall, the Parents informed the school of their intent to have A.P. undergo an

independent psychiatric evaluation at the Connecticut Children's Medical Center. The evaluation took place in the spring of A.P.'s fifth-grade year. Upon receiving the independent evaluation, the Parents requested that a planning and placement team ("PPT") be convened in order to determine whether A.P. was eligible for special education. A PPT meeting was immediately convened, at which A.P. was designated a special education student based on the conclusion of the Children's Medical Center that he suffered from a non-verbal learning disorder. The PPT then created an individualized education program for A.P.'s sixth-grade year.

The Parents essentially challenge the use of CSTs on three grounds. First, they argue that the school's routine use of CSTs as a pre-referral process is a *per se* violation of the IDEA because it circumvents the IDEA's procedural requirements. Second, they argue that the school utilized the CSTs in order to prevent the Parents from making a referral under the IDEA and that the school thwarted their attempts to have A.P. designated as a special education student. Third, they claim that if CSTs are permitted under the IDEA, then all of the procedural safeguards that apply during the referral process must also apply during the pre-referral process. In particular, they contend that they were not permitted to participate in the CSTs, were not informed that they were taking place, and were not informed of the results of the CSTs as is required for referrals under the IDEA.

The Hearing Officer ruled in favor of the Board on all three claims. First, she found nothing objectionable about the use of CSTs as part of the regular pre-referral process. The Court agrees. As the Hearing Officer observed, CSTs are "a regular education function" that give local education agencies an additional tool for assisting and identifying struggling students. *See* Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 14. Connecticut law requires that "[b]efore a child is referred to a planning and placement team, alternative procedures and programs in regular

9

education shall be explored and, where appropriate, implemented." Conn. Agencies Regs. § 10-76d-7. The use of alternative programs, such as CSTs, is not inconsistent with the IDEA. For it is sensible policy for LEAs to explore options in the regular education environment before designating a child as a special education student.[2]

Second, the Hearing Officer rejected the Parents' argument that the school used the CSTs to prevent students - and A.P. in particular - from being referred to special education. The Court is equally unpersuaded. The CSTs did not act as a "roadblock" to prevent the Parents from requesting a referral for one simple reason: the Parents could have requested a referral at any time. The regulations provide that "either a parent of a child or a public agency may initiate a request for an initial evaluation to determine if the child is a child with a disability." 34 C.F.R. § 300.301 (1999). The Hearing Officer found, and the Parents do not dispute, that the Parents "had not submitted a request to have a child evaluated for a disability or identified as a child with a disability" as was their right under the regulations. *See* Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 14. Although the Parents claim that they did not know they had this right, all evidence points to the contrary. The Parents admit that they received several copies of their procedural rights from the

---

[2] In fact, new federal regulations that went into effect in 2006 confirm that pre-referral processes are permissible under the IDEA. Under 34 C.F.R. § 300.302 (2006), "[t]he screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services." The Department of Education received a comment during the comments period that "recommended clarification regarding whether States can develop and implement policies that permit screening of children to determine if evaluations are necessary." 71 Fed. Reg. 46540, 46639. The Department of Education responded that "[t]here is nothing in the Act that requires a State to, or prohibits a State from, developing and implementing policies that permit screening children to determine if evaluations are necessary." *Id*. While this regulation was not in effect during the time period in question, it bolsters the Court's reasoning that CSTs are, and always were, permissible under the IDEA.

school and the Board submitted a release signed by Mrs. Powers that stated that she had received notice of her rights. Furthermore, the Parents were not strangers to the IDEA. A.P. had previously been classified as a special education student in pre-school and had been through the referral process several times. And during the time period in question, Mrs. Powers worked for the school district and could have easily sought out the information she claims not to have received.

The Parents also argue that any request for a referral would have been futile because the Board's policy was to initially refer every child to a CST. The problem with this argument is that there is absolutely no support for it in the record. In fact, when the Parents finally did request a referral at the end of A.P.'s fifth-grade year, the school convened a PPT immediately. Although this fact would seem to suggest that the school was not seeking to prevent A.P. from being referred, the Parents argue that it *supports* their argument. Their reasoning appears to be based on the fact that the school waited to convene the PPT until an outside evaluation concluded that A.P. suffered from a non-verbal learning disability and that, even then, there was disagreement at the PPT meeting about whether to classify A.P. as a special education student.

The Court finds the Parents' argument unavailing. The fact that a PPT was convened only after the independent evaluation is easily explained by the fact that everyone – the Parents and the school – were waiting for the results of the Children's Medical Center evaluation before making any decisions regarding A.P.'s education. In fact, Mrs. Powers admitted in her testimony that she told Ms. Foisy at a parent-teacher conference that the Parents were waiting on the results of the evaluation and that they would share them as soon as they received them. It would have been pure folly for the school *sua sponte* to convene a PPT and make a decision on whether A.P. was eligible for special education services before learning the results of the evaluation. And the school can

hardly be faulted for the fact that the Children's Medical Center took longer to issue its evaluation report than anyone expected.[3]

Finally, the Hearing Officer properly rejected the Parents' argument that the procedural requirements of the IDEA apply to pre-referral processes such as CSTs, finding that "[a] student is not afforded the rights of procedural safeguards which are required upon initial referral for special education or when a parent requests an evaluation." Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 14. The IDEA provides "an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in all meetings with respect to the identification, evaluation and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child." 20 U.S.C. § 1415(b)(1) (2000). The Hearing Officer concluded that these procedural protections are triggered by a PPT referral. The Court concurs.

If, as the Parents argue, any "meeting" regarding a child who is having difficulties triggered the procedural protections of the IDEA, then almost any action at all on the part of the school would constitute a referral. In essence, the Parents argue that merely discussing the possibility of a referral becomes a referral and that any time a child is not referred to a PPT, the school has made an unlawful finding that the student does not qualify for special education. Not only would such a system be counterproductive by discouraging teachers from communicating concerns about students, it would also prevent schools from trying alternative strategies for students who, while perhaps not meeting the statutory definition of a "child with a disability," are in need of extra help in order to succeed academically.

---

[3] The Board ultimately reimbursed the Parents for the full cost of the evaluation.

The Court would also like to point out that the Parents were, in fact, involved in the CST process. The Parents and Ms. Foisy were in regular contact during the fall of A.P.'s fifth grade year. Although the Parents claim that they were not informed about the CSTs, Ms. Foisy testified that she informed Mrs. Powers that the CSTs were to take place and also shared the results of the CSTs with her afterwards. Mrs. Powers admitted as much in her testimony, although the Parents still strive to make the opposite argument here. Regardless, the Hearing Officer found Ms. Foisy credible, and as discussed above, the Court defers to that determination. The Court, therefore, affirms the Hearing Officer's decision with respect to the use of the CSTs and finds that the Board did not violate the IDEA during A.P.'s fifth-grade year.[4]

## C. Free and Appropriate Public Education (FAPE)

The Parents also sought review on whether the Board provided A.P. with a free and appropriate public education during his sixth-grade year. FAPE requires both that the "special education and related services . . . are provided in conformity with the individualized education program," *Rowley*, 458 U.S. at 188, and also that the IEP is "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207. Although the Parents appeared to contest at various points whether the IEP developed for A.P. for his sixth-grade year was "reasonably calculated" to enable him to receive educational benefits, Plaintiffs' counsel clarified at oral argument that the Parents were not contesting the adequacy of the IEP. Therefore, the only issue before the Court is whether the school complied with the IEP.

The Parents argue that the school failed to comply with the IEP in several ways. First, they

---

[4] Because the Court did not find a violation of the IDEA in A.P.'s fourth- or fifth-grade year, the Court does not reach the question of what compensatory services A.P. would be due if there had been a violation.

13

contend that A.P. did not have a shared classroom aide as required by the IEP. Second, they assert that A.P. did not have access to an AlphaSmart in the classroom as required by the IEP. Third, they argue he was not provided social skills training in compliance with the IEP. Finally, they claim that the school failed to collect objectively measurable data with which to chart A.P.'s progress in the manner stipulated by the IEP.

The Hearing Officer found that the Board had substantially implemented the IEP and that any "failure to have the child's program comport with the IEP was largely due to the parent's delays." Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 17. The Court agrees with the Hearing Officer.

1. Shared Aide. On the first day of school, the school realized that A.P. had been placed in a classroom without a shared aide. The school immediately contacted Mrs. Powers to inform her that the school would be moving A.P. into a classroom with an aide. However, Mrs. Powers instructed the school to keep A.P. in his original classroom for the time being until a solution could be found. The school complied with her request. A month later, the school again contacted the Parents to convene a PPT in an attempt to resolve the issue. The Parents informed the school that they were consulting an attorney, who would be contacting them soon. The Parents' attorney did not send a letter to the school until December 27, 2005, over four months after the mistake had originally been discovered and communicated to the Parents. The school immediately called a PPT. The Parents attended this PPT, as the Hearing Officer noted, "only long enough to notify the LEA of [their] intent to place the child in a private school." Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 17.

The Parents argue that it would have been disruptive to move A.P. after he had already been

14

placed in a classroom. The Hearing Officer rejected this explanation, as does the Court. At the point that the mistake was discovered, only half a day of school had passed. It is disingenuous for the Parents to argue that moving A.P. after only a half a day to another classroom would have been disruptive. The Parents appear to argue that the only satisfactory solution was for the school to hire an additional aide. As the Hearing Officer points out, "[t]his is not a question of conformity with the IEP. It is a question of whether the IEP or the parents can determine the assignment of personnel." *Id*. at 16. The Court agrees with the Hearing Officer that they cannot.

The school followed Mrs. Powers' instructions in good faith and then continued to seek a resolution with the Parents. The Court finds that the Parents, not the Board, are responsible for the fact that A.P. did not have a shared aide in the classroom during the first half of his sixth-grade year.[5]

2. AlphaSmart. Although the IEP stated that A.P. was to have access to an AlphaSmart, there was no AlphaSmart in A.P.'s classroom and in order to use it, A.P. had to request it from the school library. The Hearing Officer did not reach this specific issue, but as the Board points out, the IEP only requires that A.P. use the AlphaSmart "as needed." A.P.'s teachers testified that he did not need the AlphaSmart most of the time and that he often used the classroom computer instead. In fact, there was testimony, and counsel at oral argument agreed, that A.P. resisted using the AlphaSmart and that he did not want to use it.

The Court finds that the Board complied with the IEP. Although the Court is not familiar

---

[5] In fact, A.P. was moved into a classroom with an aide in January, before the final PPT meeting and before the Parents informed the school that they intended to withdraw him from Woodstock Middle School. And, as the Hearing Officer noted, "[i]f there was any sincere interest in resolving the issue the father would have agreed to attend an IEP meeting [in the fall] as the LEA requested and as the law requires." Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 17.

with the AlphaSmart, evidence on the record suggests that it is a word processing device similar to a computer, to which A.P. did have access in his classroom. Furthermore, the testimony of his teachers showed that A.P. was provided with the AlphaSmart "as needed."

3. Social skills training. A.P. did receive social skills training in the sixth grade. However, the Parents argue that social skills training was insufficient because it was conducted in a group setting and thus not "individualized." The Hearing Officer found, and the Court agrees, that this claim is baseless.

Ms. Coleman, the special education teacher, specifically testified that the social skills program that she conducted was individualized for A.P. and that she designed it based on the objectives in his IEP. The fact that Ms. Coleman conducted the social skills training with the entire class rather than with A.P. individually does not mean that she failed to comply with the IEP. As the Hearing Officer held, "[t]he program does not fail to provide the child with FAPE because of the location of the service." Hearing Officer's Final Decision and Order [doc. # 26], Ex. AR-1 at 18. Common sense would suggest that social skills training would be more effective in a social setting. In fact, Dr. Kulas suggested that A.P. would benefit from "a social skills training group of his peers." Dr. Kulas suggested individual social skills training only "[i]f he appears to be less able to tolerate this type of [group] setting." Administrative Record [doc. # 26], Ex. B-12 at 14. Thus, the Court finds that it was reasonable for the school to conclude that the IEP could be effectively implemented through group social skills training.

4. Objectively measurable data. The Parents' final argument is that the school failed to collect objective data on A.P.'s progress as required by the IEP. In their brief, the Parents seem to argue that the school failed to collect any objective data at all and thus failed to show that the A.P.

16

was making progress as required by the IDEA. The Board counters that they did collect objective data in the form of grades, standardized tests and teacher observations. The Court agrees with the Board that the data collected by the school is relevant under the IDEA. The Second Circuit in *Walczak,* 142 F.3d at 130, explained that "the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress" and further noted that "this court has looked to test scores and similar objective criteria" when evaluating whether a child received FAPE.

At oral argument, the Parents shifted their argument. Plaintiffs' counsel argued not that the school had failed to collect any objective data, but that the school had failed to collect the type of data that was specified on the IEP. The IEP specified that A.P. would achieve 80% compliance with certain of the IEP's objectives. The Parents argue that it is impossible to know whether A.P. achieved 80% compliance without also collecting baseline data. The school did not test A.P. at the beginning of the school year which, the Parents argue, would have been required in order to determine whether A.P. was making progress on the IEP objectives.

The Board argues that achieving 80% compliance did not require that the school collect baseline data. For instance, one of the IEP goals was for A.P. to turn in his homework 80% of the time. The Board argues that A.P.'s teachers would check off every time he turned in his homework. If he turned in his homework at least 80% of the time, the school deemed him to have achieved that particular IEP objective. A few of the IEP objectives did require the school to collect pre- and post- baseline data. For instance, one IEP objective was for A.P. to develop positive relationships with his peers and the IEP stated that the school would collect pre- and post- baseline data. Ms. Coleman testified that she did keep pre- and post-baseline data on these IEP objectives. Although the Parents

argue that Ms. Coleman didn't collect *objective* data, the Court has a hard time envisioning what such objective data would look like. Whether A.P. has developed positive peer relationships seems to be a necessarily subjective determination. Ms. Coleman made observations about A.P.'s progress on this objective and this was all that was required by the IEP. Therefore, the Court agrees with the Board that the school satisfied its obligation to collect data to measure A.P.'s progress.

**D.     The Rectory School as an Appropriate Placement.**

Because the Court finds that the Board provided A.P. with FAPE during his sixth-grade year, it does not reach the question of whether the Rectory School was an appropriate unilateral placement. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985) ("If a handicapped child has available a free appropriate public education and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility." (citing 34 C.F.R. § 300.403)); *Briggs v. Bd. of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989) ("Because we conclude that the Board had offered James an appropriate placement, the Briggs are not entitled to reimbursement of the costs of sending James to The Soundings.").

**IV.**

The Court would like to emphasize that it has no doubt whatsoever that the Parents are truly motivated by a good faith desire to obtain the best education possible for their son. They are proud of their son and rightly so. According to the Parents, A.P. thrived at the Rectory School. The Court sincerely hopes that he will continue to thrive and will receive all of the help he needs to have a successful academic career. However, for the reasons stated above, the Court affirms the Hearing Officer's decision. Therefore, the Parents' Motion for Judgment on the Record [doc. # 30] is DENIED and the Board's Motion for Judgment on the Record [doc # 35] is GRANTED. **The Clerk**

**is directed to enter judgment for the Board and to close this file.**

IT IS SO ORDERED.

/s/      Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: August 19, 2008.**